I want to try and make four points in the time I have available this morning, and I want to go through those points narrowly. I think the first point that needs to be made in this case is that in none of the precedent before this Court is there a fact pattern where law enforcement stands by looking for traffic violations when criminal harassment is being committed against a family for its political views. There is no such fact pattern. There is no fact pattern in this country where there has been a deliberate policy decision made not to cite criminal harassers for criminal conduct because it is decided that that criminal harassment constitutes a free speech. And there is no fact pattern in this country where because of that policy of refusing to cite criminally the criminal harassment, that harassment has become a school tradition, a tradition carried out through years. The second point, the trial court in this instance granted summary judgment on this case because it found that there had been no showing or evidence of a municipal policy. The policy in this case took some time to sort out, but in fact what ultimately evolved was a law enforcement policy whereby law enforcement would enforce only traffic laws against criminal harassers because it was determined that the criminal harassment constituted free speech. And that policy was articulated by Deputy Bowers for the first time in September of 1999 in his confrontation with Mrs. Studer outside of her home in the midst of his road rally. It went all the way up to the prosecutor of Stevens County who likened what was happening to this family to organized demonstrations on the part of the students against this family like the world trade riots in Seattle. Is the prosecutor a defendant here? The prosecutor, Your Honor, was not joined and the reason was the prosecutor laid the blame on the And, in fact, that was the case. We actually had polled instances where people had been stopped in vehicles by law enforcement in the middle of the morning, and while there had been a police report written, there actually was no identification of the occupants of the vehicle. So there was insufficient information to be able to tie, in our opinion, prosecutors to the primary deprivation of rights. I'm having some trouble understanding your claim, though, because this claim that you're now making sounds like inefficient and sloppy investigation as opposed to a purposeful decision that we will not take any action against somebody because they, too, are exercising their first amendment rights. The claim is based on a purposeful decision. The sloppy investigation is an element, in our opinion, of the potential for complicity. And what's your best evidence that there was a purposeful decision? The statements of Deputy Bowers and the statements of the prosecutors that they will not suppress these students' free speech rights. In the face of conduct that has been described both by Stephens County Captain, retired Captain Dwayne Gagnon, as criminal harassment, and that has also been described by the experts in this case as criminal harassment, and which was criminal harassment per se, the evidence in this case is that these students ganged up in force, particularly in these road rallies, for the purpose of property destruction, intimidation, shooting paintballs at the home, mooning the occupants, et cetera, and that there were so many vehicles out in front of this home during these road rallies that they literally could get stalled out there for 45 minutes just trying to get out of it. So in this case, this is really similar to the Duares case. It's perhaps most similar to the Duares case because what you had here was a situation also of preapproval. In the Duares case, what the court there focused on was the police officers literally staying to the skinheads prior to these free speech demonstrations. You know, as long as you don't get out of control, we'll let you go. And that was seen by the Duares court as a condoning or a ratification of the harassment to take place so long as it didn't get outside the box. Well, in this case, what you have is you have Deputy Bowers who, in being told who the leader of one of these rallies is, goes to that leader and says, any violation of the traffic laws will be dealt with per the traffic code. And this became the tough thing to understand in this case. Why are they out there citing these people for traffic violations when there is criminal harassment going on? And the inference and the evidence became because they believed this criminal harassment to be free speech. Do you have any incident other than the one statement by Bowers as far as internal from the department? We have the, we think that the one statement is enough. I mean, it seems to me sort of one statement does not a policy make. So how do you get over that problem? The one statement has to be looked at, first of all, the one statement is evidence. And this is a summary judgment level. But second of all, the statement has to be looked at in the context of this continuing year after year after year and becoming a tradition with no criminal sites. And when you put the two together, you find that for some reason there has not been any criminal law enforcement against these teenagers. And the question becomes why. And you have that, essentially, that smoking gun of at least the one officer saying, I am not going to arrest or charge these kids for their exercising their free speech. And we have in fact, there is evidence in the record that the prosecutor had had conversations with some of the upper level Stevens County enforcement individuals. The timing of those conversations is a little unclear. That was unclear in the record. But what we have is basically this running from the patrol officer who was supervising at the scene, potentially up to the prosecutor himself. I also want to make the point related to this trial court's decision about no showing that there was deliberate indifference to the rights violations. This is a unique case also, and it led to the problem in answering the question, is this a policy of action on the part of the Stevens County or is it a policy of inaction? And in fact, it's both. Because in this case, there was a policy of action which would relate to complicity, and that is pre-approval, ratification in advance, police presence while these offenses are ongoing, without stopping, prolonged assaults against the family in police presence, making the family more vulnerable as a result, and placing the family literally in danger as a result of lack of criminal enforcement over the years. That constitutes a policy of action. And that action is we're not going to cite you for criminal offenses. We're only going to look and see if you have any burnout taillights. It also constitutes a policy of inaction at the same time, because the decision has been made. We are not going to cite these kids for criminal harassment. We are only going to include traffic laws. I understand you're particularly concerned about criminal activity, but did this family have any right to bring some civil action on these facts? Not until – I think it was not until there was an understanding of what was occurring in some sense with Mrs. Studer saying, you know, these kids are trying to shut me up. Does it matter? Has we decided the case? Does it matter? Does it matter that there might have been some civil remedy available, but nothing was done about it? I don't think that there was a civil remedy available, Your Honor. I'm not suggesting that there was. I'm looking at the facts, and I'm listening to you talk about harassment, and I'm asking you if there was. And if so, would it matter? I don't think there was, number one. I understand that. But if there was, would it matter? It would not matter. All right. Why? Because ultimately, what the case boils down to is the family has no ability to deal with these hoards in front of its home by any means other than ultimately what Mrs. Studer did one day, which was to go out in the front yard with the shotgun and try and stop the rally from going by the house. Little self-help. So then between this lawsuit and a shotgun, there's no other remedy? Is that your position? You know, in this instance, I don't think there was. And let me also say that that very reality is what causes the classic DeShaney exception here, because this family, even though it wasn't inside a prison, the exception in DeShaney that allows for this kind of action is where the State will not let the person defend itself, in effect, but it will protect her. And that's exactly what you had in this instance that was classically illustrated by that incident in September of 99, where the woman went out to say, okay, I've had enough of this. I'm going to defend myself on my own. And she was detained and ultimately criminally cited. So there was no longer a remedy for this family. Your Honors, I see that I have 35 seconds left, and I'd like to reserve those for rebuttal, if I could. Very well. May it please the Court. Good morning, Your Honors. My name is Mick McFarland, and I am one of the attorneys representing Stevens County in this case. At the heart of the Studer's claims against Stevens County is the allegation that liability rests with Stevens County's alleged failure to protect the Studer's from the private acts of the citizens, and specifically the private acts of the students of Lakeside High School. However the Studer's want to characterize their claims against Stevens County, however, whatever constitutional rights the Studer's want to allege that they were liability against Stevens County rests with allegations of inaction and omission as opposed to being based upon affirmative conduct taken by Stevens County against the Studer's to deprive them of their civil rights. And the Studer's, in fact, have not in this case, and they cannot, point to any affirmative conduct that Stevens County engaged in which did deprive the Studer's of any civil rights, but instead, as Your Honors have pointed out, the allegation is we failed, Stevens County failed to protect their civil rights from the private acts of these citizens. And that is exactly the reason, Your Honors, that summary judgment in this case was appropriate. How do you deal with the ratification argument? That is, that when the students were told, we won't prosecute, don't disobey any regulations, in a sense, that was much akin to what the Second Circuit was looking at in the Skinhead case and saying, we're giving you consent in advance to do this. I don't believe that it is akin to ratification, Your Honor. I think it's more akin, the argument is more akin to the arguments that have been foreclosed by the shame that the failure to arrest has emboldened the criminals to further engage in the criminal conduct. And that argument was first rejected in the shaming and then was subsequently rejected in this circuit in the DeMaria versus Washington County case where the court, that's a district court level case, where the court directly addressed the issue that was being posited by plaintiffs in this case. And that is, because you failed to arrest the harassers in that case, it emboldened them to continue the harassment. And the DeMaria court rejected that. And it was then just recently rejected again by the Western District of Washington in the Johnson versus Seattle, City of Seattle case, which dealt with the Mardi Gras case. And the court said that that argument was precluded by the shame. What if the department had a policy that said that we're not going to make any arrests if we believe that somebody is exercising their First Amendment rights? Would that be a policy that would then be implicated here? I kind of have a two-part answer to that. First, I want to make sure that we're clear that I believe there's been a mixing of apples and oranges in this case, because there's been discussion by counsel in the briefing that the deputy stood by and did nothing and told the students that they weren't going to make an arrest. No, but that's not my question. My question is if there were such a policy. In fact, what Bowers may have said, if there were such a policy that we're not going to arrest people if we think that they're exercising their First Amendment rights, and we don't care if it infringes on somebody else's First Amendment rights. If that were a policy, and there were a factual basis for it, would this case have to proceed to trial? No. It would not, because the case would still squarely fall within the realms of De Cheney and the subsequent case law, which says that even if the government has noticed that somebody's civil rights are being violated and stands by and does nothing in light of facts that something more should have been done, there is no constitutional violation and there's no cause of action against the governmental entity for standing by and doing nothing. Well, what if it were the Mendocino case where, in effect, it's some kind of a joint action, complicity or conspiracy between the police and, in this case, the students to violate the rights of the students? Right. And that's where I think this case differs from the Mendocino case as well as from the Duares case relied upon by plaintiffs, because there isn't evidence that there was any type of complaint or that there was any type of complicity or there was a prearranged agreement, as there was in Duares, to stand by and do nothing. The evidence actually, Your Honor, is undisputed to the contrary that while... So if there were such a kind of a stand by, do nothing agreement, if there were evidence of that, that would be the kind of policy that would at least go to trial? Depending upon what the agreement to stand by and do nothing related to. If it related to the car rallies where the cars would drive up and down the streets, yell and scream and make a lot of noise and try to garner support for the homecoming, then no. If the policy was to stand by and allow and watch actual criminal violations be conducted against the students, then yes, that would be a fact pattern that would have to go to the jury. I cited to the court or submitted to the court just yesterday, and I apologize for the lateness of that, four recent cases that I think are relevant to this court's decision in this case. I've mentioned one of them, and that was the Johnson v. City of Seattle case, which I think has fact pattern similar to what we're dealing with in this case, whereby the allegation was the Seattle case. The Seattle police stood by and didn't intervene quickly enough in riots that led to injury of participants in those riots. The second case I cited to the court yesterday was the Jameson v. City of Morton case that similarly is a western district of Washington case decided on March 29th of 2006. And I think that case is important because it highlights again that even if a governmental entity or a federal agency decides to intervene in a case, it's not going to do anything about it. If a governmental entity has knowledge of a potential criminal act and that that potential criminal act can result in a constitutional deprivation to one of the citizens, the governmental entity has no constitutional obligation to step in and bar that act. And in that case, it dealt with an officer who made contact with an intoxicated minor who knew the minor was obtaining more alcohol and that the minor was drunk. And he was driving other minors around in his pickup truck, and yet the officer didn't do anything with respect to that situation. And tragically, the minor drove away and rolled out of the vehicle and killed the occupants of the vehicle. And the western district of Washington, citing DeShaney, said that there isn't that affirmative obligation to step in, even though there is knowledge that there is a potential for criminal conduct and constitutional deprivation. The other case I cited just yesterday was a recent case decided by this Court, the Kennedy v. City of Ridgefield case. That was decided likewise by this Court in late March of 2006. And I think that case is important because although the Court found the danger-creation theory to be an exception to the general rule that there's no duty to step in on the part of a governmental entity to protect the citizen, civil rights of citizens. The guy wasn't drunk at the time. He got drunk after the police had a contact. He had the potential, but he wasn't. He consumed more alcohol, and at the time of the accident, he was drunker than he was when the police stopped him. So you rely on one of the facts that just halfway as far as you want him to go, he may find himself not on as firm a ground as you want to be. If you're talking about the Jamison v. Morton case. The last one, the 26th, 2006. The kid who had the beers, he was drunk, but the reading says he got drunk. He wasn't that drunk when the police saw him. But it doesn't matter because this case is going to determine the record that's before us. And running out of time, Your Honor, so I just want to... But before you leave the danger-creation theory, I mean, here we have a situation where there are 70 calls, and you think, well, there's vandalism. We know the rallies are coming. It certainly emboldens people if they have a rally and nothing happens year after year. I mean, when is the state to be considered to have knowledge? On the 10th time, the 20th time, the 40th time, the 60th time? I'm not sure that it's relevant, Your Honor, because whether or not the state has knowledge isn't the dispositive issue, because from DeCheney to all the other cases that have fallen in line with the DeCheney holding, there has, in fact, been actual knowledge of the constitutional deprivations, and the Court still found that that doesn't allow the plaintiff to bring suit against the government committee for not stepping in. Your time has expired. Thank you, Your Honor. We'll give you two minutes for a vote. The bright line in this case is criminal harassment as a school tradition. That is the bright line. Criminal harassment as a school tradition, just be sure your tabs are current. That is the fact pattern in this case. DeCheney provides for an exception when there, in fact, is a right to enforcement, and that exception is where the actions of the state have rendered the family more vulnerable, and the state will not then protect. Ms. Schultz, can you give us a succinct statement of the issue you think we must decide today? The Court needs to decide that there was evidence sufficient to support a municipal policy of a decision to cite only traffic and to allow criminal harassment against the family to proceed over the years to the point where it became a school tradition. The only thing implicit in that decision is knowledge, deliberate indifference, complicity, all of the other elements of what this case ultimately should turn on at the time it goes to the jury. I understand your ratification and danger creation theories. What is your best evidence, inferentially or otherwise, that there was complicity or joint action between the department and the students? Well, we have interesting evidence from one of the students who testified that the students knew the deputies. They had gone to school with the deputies, and that this was a school tradition. And so what you have in that sort of fact scenario are deputies who had previously been involved in the rallies as students who are now operating as deputies for Stevens County and allowing the rallies to continue to go on. But were these the once-a-year homecoming rallies? Yes. But she's alleging some 70 to 100 different incidents, you know, a beer bottle here, a woo-woo-woo call as somebody drives by, and they're all over the map. So if you're narrowing it now to the once-a-year homecoming rallies, is that what you're focusing on in terms of the school sanctioned conduct? You know, the rallies were simply the most overt, showy demonstrations of harassment. But the harassment was known throughout the school, was discussed, actually. The woman who had been the class valedictorian had provided some testimony that this was as well known throughout the school and that the police were not a deterrent. One of the boys who was involved in one of the rallies, Jeremiah Johnson, had talked about how it was really mandatory that students from senior level on down to the junior level, up to the freshman level, participate in these things, get out there and do something or you're walking home. So this was something that had gone on throughout the school, and coincidentally, the school where these deputies had gone to school and everyone knew each other. That is the evidence of complicity. It's an inference. Why did something stronger not happen? And why was this family left as vulnerable and as pressure? Was there another high school in that town? I think not. So it would seem to me to be an odd inference to draw that the deputies were complicit simply because they had graduated from the sole high school in town. I think it goes beyond that in the deputies picking kids up in the middle of the morning and not identifying them in police reports, as an example. Claiming that they didn't know who the kids were when, in fact, they all knew each other. These are all indicia of the potential for complicity. So it's sort of the see-no-evil posture that the police department or the sheriff's department took that would really be the complicity. See-no-evil, if one could even give to the police department an understanding that what was happening was evil, because the problem here is that the police department was claiming that it was not evil, that it was free speech. Anything you want to say to sum up? That's all I have, Your Honor. Thank you very much. The case should certainly be submitted. We thank you for your arguments and your briefing, and we'll proceed to the next case on the oral argument calendar, which is Rogers v. Romali.
judges: Farris, Thomas, McKeown